Filed 11/9/20  In re K.R. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re K.R., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.R., <br><br> Defendant and Appellant. | F081332 <br><br> (Stanislaus Super. Ct. No. JVDP-19-000201) <br><br> **OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Boze, County Counsel, and Maria Elena Ratliff, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Levy, Acting P.J., Poochigian, J. and Franson, J.

A dependency court terminated appellant M.R.'s parental rights after finding that the Indian Child Welfare Act (25 U.S.C. § 1901 et seq; see also Welf. & Inst. Code, § 224 et seq.)[1] (ICWA) did not apply to his case. We conclude the ICWA finding was not supported by sufficient evidence. Specifically, there is insufficient evidence the Stanislaus County Community Services Agency fulfilled its duty of further inquiry under section 224.2. Consequently, we must reverse and remand for proper inquiry. If, on remand, the court and the Agency fully comply with section 224.2, and the court again finds that ICWA does not apply, the court may reinstate the order terminating appellant's parental rights.

FACTS[2]

*Events of August 18, 2019*

On August 18, 2019, the Stanislaus County Community Services Agency (the "Agency"), received a referral indicating that M.R. ("Father") would lock his 4-year-old daughter, K.R., in her room with a port-a-potty for hours. A relative said K.R.'s bedroom windows were "boarded up." K.R. "reek[ed]" of urine.

That day, police officers went to Father's residence to check on K.R., but Father would not allow officers to enter.

A relative told social a worker that Father has mental health issues and has threatened to kill her (i.e., the relative). The relative said K.R.'s mother is homeless and her whereabouts are unknown. She also explained that Father had previously said on several occasions that he would "kill whoever he had to kill if someone tries taking

---

**1** All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

**2** "Because compliance with the ICWA is the only issue raised in this appeal, our discussion of the facts and procedural background focuses on the facts relevant to compliance with the ICWA." (*In re I.B.* (2015) 239 Cal.App.4th 367, 370.)

[K.R.].” Father was also saying that he had no reason to live anymore, and that he had demons in his head.

*Events of August 19, 2019*

The next day, on August 19, 2019, police went to Father's home with a warrant. Officers observed several axes and swords hanging on a wall next to the front door.

K.R.'s room smelled “strongly of urine,” and there was feces on the bedroom floor and in the closet. Officers described the urine smell as “overwhelming.” Officers could tell the floor was soaked in a liquid just by stepping on it.

The bedroom door appeared to have scratch marks. The bedroom's window had plywood covering it, preventing sunlight from getting in.

Officers informed Father he would be arrested for child endangerment. Father became agitated and began yelling profanities at the officers. After being handcuffed, Father “flopped on the floor and began screaming at the top of his lungs.” He said he was going to “blow up.” He said to social workers, “These whores better not put their hands on my child.”

A social worker attempted to give Father paperwork with information, including the date and time of his dependency hearing. Father tried to spit on the paperwork and said, “[T]hrow it away.” As social workers left the home, Father yelled, “[D]on't touch my daughter you f[**]king sluts.” The social workers were unable to have a conversation with Father due to his “escalated and agitated demeanor.”

K.R. was taken into protective custody. Her hair was so thin that social workers observed areas of her scalp were visible. She was thin and pale.

As the social worker transported K.R., she noticed marks and bruises on her legs. When asked about them, K.R. said her dad hits her legs which makes her “legs cry.” K.R. also said her “auntie is mean.” K.R. said she did not want to go back to Father's house because he is mean.

3.

A social worker noticed K.R. was squirming and asked if she needed to go "potty." K.R. responded, "No, my pee-pee hurts and it has pepper on it because daddy is mean."

Later, K.R. told a social worker that an "owie" on her right leg was from Father biting her. On several occasions, K.R. said she did not want to go to back to "daddy's house."

*Petition*

On August 21, 2019, the Agency filed a dependency petition (§ 300) alleging that Father would lock K.R. in a "boarded up" bedroom for hours; that K.R. reeked of urine; that marijuana joints were found "all over the home"; and that Father was reported to have "mental health issues"; among other allegations.

The petition alleged that K.R.'s mother, V.R. ("Mother"), had "mental health issues" and a history of drug abuse. V.R.'s whereabouts were unknown and reasonable efforts to locate her had been unsuccessful.

*Detention Hearing*

The court held a detention hearing on August 22, 2019. Father was present, Mother was not. Father filled out Judicial Council Form ICWA-020 and indicated thereon that he "may" have Indian ancestry in the Cherokee tribe. The court asked Father if he or any family members are enrolled in any of the Cherokee tribes. Father replied that he did not know. Father also said he did not know whether Mother had any Native American ancestry.

The court stated that ICWA "may" apply.

*Maternal Grandmother's Report of No "American Indian" Ancestry*

On September 5, 2019, maternal grandmother reported to the Agency that her family has no "American Indian ancestry."

*ICWA Notice*

On September 6, 2019, the Agency sent ICWA notices to three Cherokee tribes and the Sacramento Area Director of the Bureau of Indian Affairs (the "Notice"). The Notice included Mother's name, former address, date of birth and state of birth. The Notice stated that Mother's current address, tribal information, and death information were all "unknown." The Notice also included Father's name, current address, date of birth, state of birth and possible tribe ("Cherokee"). The Notice stated that Father's former address, tribal enrollment number, and death information were "unknown."

The Notice identified all four of K.R.'s grandparents' names and dates of birth. The Notice provided maternal grandparents' addresses but listed paternal grandparents' addresses as "unknown." The grandparents' tribal statuses were also listed as "unknown."

The Notice also identified K.R.'s four maternal great-grandparents' names and birthdates, three of whom were deceased. The address of K.R.'s living maternal great-grandmother was also provided. The maternal great-grandparents' tribal statuses were listed as "unknown."

The Notice also identified three of K.R.'s paternal great-grandparents' names, birthdates, and dates of death. The paternal great-grandparents' tribal statuses were listed as "unknown." No information was provided for one of K.R.'s paternal great-grandfathers.

In a section titled, "Other relative information," four relatives were listed: P.H.R. (same last name as Father); K.L.T.; D.M.K.; and S.C.S. P.H.R. was identified as a "paternal cousin." The remaining three relatives were listed as second cousins without explanation as to whether they were paternal or maternal relatives. An address and date of birth was provided for each of the four relatives.

*Social Worker Efforts*

A placement specialist with the Agency sent letters to K.R.'s relatives identified in something called the Youth Connections Database. One paternal family member responded via email on September 9, 2019, saying he/she could not help or support K.R., nor could any of the relative's siblings.

On September 23, 2019, a social worker asked Father if she could interview him regarding his "social history." Father agreed. However, after several questions, Father accused the Agency of causing K.R. to suffer trauma and refused to answer questions.

*Jurisdictional / Dispositional Hearing*

A joint jurisdictional/dispositional hearing was held on December 5, 2019. The court denied reunification services to Mother and Father and set a hearing under section 366.26.

*Motion to Determine ICWA Applicability*

In a filing dated December 19, 2019, the Agency requested that the court determine that ICWA does not apply to this case. The request included written responses the Agency had received from the three tribes to which ICWA notice had previously been sent. Each of the responses indicated that K.R. was not a member of the tribe. Each of the responses also contained the caveat that the determination regarding K.R.'s nonmembership was based on information provided by the Agency. On December 23, 2019, the court granted the Agency's request, finding ICWA did not apply.

*Section 366.26 Hearing*

Ahead of the section 366.26 hearing, the Agency requested that the court terminate Mother's and Father's parental rights. The Agency requested that K.R. be placed for adoption with her maternal aunt.

At the section 366.26 hearing on June 19, 2020, the court also reiterated that ICWA did not apply. The court then terminated Mother's and Father's parental rights.

6.

**I.     There is Insufficient Evidence the Agency Complied with Section 224.2, Subdivision (e)(2)(A) by Interviewing Father to Obtain the Information Listed in Section 224.3, Subdivision (a)(5)**

*Duty of Inquiry*

The court and Agency "have an affirmative and continuing duty to inquire whether a child for whom a petition under section 300 … may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a).)  This duty of inquiry begins with the "initial contact." (*Ibid.*)

"Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child…." (§ 224.2, subd. (b).)

*Duty of Further Inquiry*

"If the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child, the court, social worker, or probation officer shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable." (§ 224.2, subd. (e).)  Such further inquiry includes, but is not limited to, interviewing the parents and extended family members to obtain the information listed in section 224.3, subdivision (a)(5), contacting any person or entity that may reasonably be expected to have information regarding the child's membership status or eligibility (such as the Bureau of Indian Affairs, the State Department of Social Services, or any tribes that may reasonably be expected to have relevant information). (§ 224.2, subd. (e)(2).)

*ICWA Finding After Further Inquiry*

A court may find that ICWA does not apply after it has found (1) that "proper and adequate further inquiry and due diligence" as required by section 224.2 has been conducted and (2) there is still no reason to know whether the child is an Indian child. (§ 224.2, subd. (i)(2).) Such a finding is "subject to reversal based on sufficiency of the evidence." (*Ibid*.)

*Analysis*

Father claims there is insufficient evidence the Agency performed its duty of inquiry (§ 224.2, subds. (a)–(b)) and further inquiry (*id*., subd. (e)).

First, Father alleges the Agency failed to perform its duty of initial inquiry. Recall, this duty of "[i]nquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child…." (§ 224.2, subd. (b).) Father claims the Agency did not ask him about Indian heritage before the dependency petition was filed. But the Agency's initial interaction with Father the time of removal at was cut short by Father's erratic and aggressive behavior. The social workers were unable to have a conversation with Father due to his "escalated and agitated demeanor." Father cannot fault the Agency for not making inquiry of him prior to the dependency petition when he was the one who made that inquiry impossible.

Moreover, the core purpose of the initial inquiry is to determine whether there is sufficient "reason to know" the child "may" be an Indian child. If so, further inquiry becomes necessary. (§ 224.2, subd. (e).) That purpose of the initial inquiry was accomplished days later, on August 22, 2019, when the court asked Father about Indian heritage, and he plainly indicated that K.R. "may" have Cherokee ancestry. The Agency assumed this constituted sufficient "reason to know" K.R. "may" be an Indian child so as

8.

to trigger the duty of further inquiry.[3]  Thus, the important question is whether there is sufficient evidence the Agency complied with its duty of *further* inquiry.

Once there is reason to believe a child is an Indian child, "further inquiry" is necessary.  (§ 224.2, subd. (e).)  One required aspect of "further inquiry" is that the Agency interview the child's parents and extended family members to obtain "[a]ll names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married, and former names or aliases, as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment information of other direct lineal ancestors of the child, and any other identifying information, if known."  (§ 224.3, subd. (a)(5).)  Here, there is insufficient evidence that the Agency performed this duty.  Specifically, the Agency cites no evidence that it interviewed Father in order to obtain the information described in subdivision (a)(5) of section 224.3.[4]

The Agency explains that, at the time K.R. was removed from her Father's home, it could not obtain certain information from Father because he was cursing at social workers.  Father was also uncooperative on a September 23, 2019, phone call with a

---

[3] When the Agency does not contest that the duty of further inquiry has been triggered, the "contested issue is the adequacy of the Agency's further inquiry." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.) We do not address whether there was sufficient "reason to believe" K.R. is an Indian child so as to trigger the duty of further inquiry under section 224.2

[4] We are skeptical such an interview will yield evidence that K.R. is indeed an Indian child.  Father's vague suggestion that he might have Cherokee heritage, while arguably sufficient to trigger the duty of further inquiry, is far from conclusive evidence that K.R. is eligible for membership in any tribe.  Moreover, the Agency did acquire significant information about K.R.'s relatives and provided the Cherokee tribes with that information, yet none of those tribes determined K.R. was eligible.  Even if Father produces new information, such as the name of K.R.'s heretofore "unknown" paternal great-grandfather, it is presumably improbable that information will establish eligibility for tribal membership.  Nonetheless, the statute clearly requires that sufficient further inquiry be performed, and we must follow that mandate.

social worker.  But the Agency fails to explain why the interview required by section 224.2, subdivision (e)(2)(A) was not done (or at least attempted).[5]  Because there is no evidence the Agency interviewed Father in the manner described in section 224.2, subdivision (e)(2)(A), there is insufficient evidence to support a finding the Agency made "proper and adequate further inquiry."  (§ 224.2, subd. (i)(2).)  As a result, the court's ICWA finding is subject to "reversal based on [in]sufficiency of the evidence."[6]  (*Ibid*.)

The Agency describes other ICWA-related efforts it made, including providing the court with a family tree and providing notice to tribes even where it was arguably not required.  However, that does not negate the fact that there is insufficient evidence the Agency performed a required aspect of its duty of "further inquiry" – to interview Father as described in section 224.2, subdivision (e)(2)(A).  Consequently, we must conditionally reverse so that the Agency can perform its duty of further inquiry.

## DISPOSITION

The order terminating parental rights is conditionally reversed and the matter remanded with instructions that the court direct the Agency to fully perform its duty of further inquiry under section 224.2. If new information is obtained, the Agency shall comply with section 224.2, subdivision (j).

---

[5] We assume, without deciding, that it would have been sufficient if the Agency tried to conduct the interview required by section 224.2, subdivision (e)(2)(A), but Father refused.  However, that is not what the record shows here.

[6] The parties disagree whether a first cousin, once-removed, identified by the Agency qualifies as an "extended family member" under section 224.1, subdivision (c) and 25 U.S.C. § 1903(2).  First cousins, once-removed, are not listed in the definition of extended family member in 25 U.S.C. § 1903(2).  Therefore, the Agency was not necessarily required to perform the interview described in section 224.2, subd. (e)(2)(A).  However, such relatives arguably qualify as a "person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2)(C).)  Therefore, and since the matter is already being remanded for further inquiry, the Agency should contact these relatives to see if they have relevant information.  (See § 224.2, subd. (e)(2)(C).)

Thereafter, the court may reinstate the order terminating parental rights if it finds, on substantial evidence, that ICWA does not apply because the Agency has conducted "proper and adequate further inquiry and due diligence" as required by section 224.2, and "there is no reason to know whether the child is an Indian child." (§ 224.2, subd. (i)(2).)